The next case is Alaska Electrical Pension Fund v. Bank of America. Good afternoon, Your Honors. Eric Hosso on behalf of Fortinbras. I'm with the law firm of Spiro Harrison. The District Court's fundamental error in excluding Fortinbras from this settlement was to conclude that Fortinbras' is-to-fix-based swap transactions with credit suites were somehow not real. The Court reached its conclusion contrary to documentary evidence and without relying on any standard, much less referring to the standards specified by the plan of distribution, that is, whether Fortinbras, and I quote, received or made payments on, transacted in, or held an is-to-fix instrument, unquote. Because this settlement is appropriately intended to include any party whose investments were in any way affected by U.S. dollar is-to-fix manipulation, which was the wrongdoing alleged in this lawsuit, this is an intentionally broad definition meant to capture any and all affected transactions. There is no dispute, Your Honors, that Fortinbras traded is-to-fix U.S. dollar instruments with credit suites. In fact, plaintiffs conceded in their brief in this court that if the claimed swaps actually existed, they would qualify as is-to-fix instruments entitled to claims against Pool A, and that's in their brief at 18. Well, but Mr. Jaso, excuse me, isn't this exactly the question, is whether they did exist or not? That's right, Your Honor. So this is basically a factual determination, is it not? Well, it's a factual determination, yes, Your Honor, but our contention is that the District Court simply ignored the evidence, the uncontroverted documentary evidence. That's fair enough. I understand that argument. It's just that I thought in your brief and then as you presented it, you said the District Court somehow misconceived the inquiry or failed to understand what the settlement agreement said. But the question is, all of those definitions and all of those elements of the definition, they either held or transacted, etc., etc., and you keep using the word transaction correctly. So the question is, were there actual transactions, and that's a factual question. Now, again, maybe the District Court got this completely wrong, I understand that, but that's the inquiry, right, whether the District Court was clearly erred by ignoring the evidence and misinterpreting the evidence and so on as to whether there were actual transactions. Well, Your Honor, yes and no. One of the fundamental arguments that we have is that the District Court simply did not even refer in its decision to the plan of distribution that I just quoted. But excuse me, I still don't see what the difference is between what the District Court decided and what you just said the District Court ought to have decided based on the plan of distribution and the class definition, which is, were there actual transactions or did your clients hold the relevant securities? That's correct, Your Honor, and indeed we did hold those securities and the investment monies were in credit suites under our management. So there were, in fact, and the swaps were applied on a daily basis to those investments as a hedging mechanism, which is quite common. And so, yes, there were transactions. In fact, there were a total of three U.S. dollar-based swap transactions per day that were wound and unwound on the underlying assets. So those transactions happened on a daily basis over several years, Your Honor. But the problem that the District Court had, Your Honor, is that the understanding that the District Court had, Your Honor, is that the District Court basically said that in its mind, the documentation that was presented was not what one would expect to see had the swaps, in fact, occurred. But the question, Your Honors, is of how to document those transactions or daily transactions over years, as I've just described, is for the counterparties to decide. There's no real reason, there's certainly no record-based reason for the District Court to set aside or ignore the documentation that were, the limited documentation, admittedly, agreed upon between Fortinbras and Credit Suisse as counterparties. What is that documentation? Can you explain to me where there is an agreement and what it says as to what documentation would take place or how there would be a recording of actual transactions between Credit Suisse and your client? Yes, Your Honor. Those agreements are set out in the Credit Suisse Structured Products Term Sheets, which are found in the Joint Appendix at 199 and 210, and those lay out how the daily transactions would take place. And then the documents that we point to are the daily confirmation emails, which basically the way that this would work, Your Honor, is that Fortinbras would tell Credit Suisse to go long or short on a daily basis based on Fortinbras' analysis of the previous days is to fix rates. So those were, they would transmit what were called signals on a daily basis to Credit Suisse, its counterparty, and then Credit Suisse would send a daily confirmation email back to Fortinbras. And the record has, we provided over 1,100 such emails between June 2008 and January 2014. And indeed, one of those emails, if I may, there is an email dated February 9, 2017, that says, today we have signaled to long the two-year USD index. That's a document 753 of page 7. So that is demonstrating in documentary form and indeed in Credit Suisse's own emails back to Fortinbras that they were executing those swap transactions as directed by Fortinbras. I guess what I'm having, I have some trouble understanding transactions of this level of sophistication. Well, Your Honor, the underlying assets belong to the investors in Fortinbras, and those assets were sitting in Credit Suisse's account. The swaps were applied to those underlying assets as a hedging mechanism. And so with your hypothetical, Your Honor, I believe the answer is that at the end of the day, notwithstanding that trading had stopped in some security that affected these underlying assets, that the swaps would be unwound or kept in place depending on the daily or the next day's directives by Fortinbras to its counterpart Credit Suisse. Let me try and get at this in a slightly different way then. The conspiracy that was alleged here, the underlying fraud, was that Credit Suisse participated in a conspiracy to fix the ISDA amounts, right? Yes, Your Honor. And that presumably benefited Credit Suisse? Yes, Your Honor. At whose expense? At the expense of investors like the ones who invested in Fortinbras, Your Honor. The third-party investors are the ones who lost, right? Well, Your Honor, it's kind of a misnomer to call them third-party investors. For example, the lead plaintiff is an Alaska union pension fund. To say that Fortinbras, as my esteemed colleague will probably argue, didn't have standing to represent the underlying fund is not true. In fact, some of the plaintiffs are characterized as money manager X on behalf of the underlying fund. But just because we did not characterize ourselves in our pleadings in that fashion doesn't mean that it's not fundamentally the same economic situation. But your pleadings set that forth? You characterized it as on behalf of in the caption. Your pleadings assert that you are asking for money to be distributed to your beneficiaries? Well, Your Honor, when we originally proposed the administrator, what we would still do if we were allowed to participate in this settlement was we would ourselves have a plan of distribution. Any proceeds that we were allocated by the administrator if we were properly included would be rateably distributed amongst our investors based on the level of their investment. One other purely factual question. Approximately what order of magnitude is your claim worth in your estimation? Well, Your Honor, we know that the administrator or the plaintiffs have set aside something in the neighborhood of $35 million. Although we've asked, you'll see in the papers that we have a nominal amount of transactions affected by this wrongdoing of over a trillion dollars. Over $3 trillion, is it not? I'm sorry if I misspoke. Over $3 trillion, yes, Your Honor, which is a very large number anywhere but Washington, D.C. But the reason is because, as I said, there's an underlying asset of more or less $1 billion on average in this account. And when you have 12 or really 3 swap transactions being done and undone a day over several years, that is where we get the number. I understand. That much I understand. I'm just trying to figure out approximately how much money is at issue. What is the amount in controversy that we're fighting over here in terms of this claim? Approximately. I understand that it might not be possible to calculate that with precision. Well, we've asked, but we haven't gotten an answer because they will not share with us what the nominal amounts of all the other claimants are. Well, yes, but look, I'm trying to be realistic and I just want a realistic answer. You folks are engaged in a significant litigation. Money is being spent. That money would not be spent unless somebody had some idea that it was worth spending. And I'm not asking you to commit to some number as if that's going to limit your future claims. I just would like to know approximately what order of magnitude are we talking about? Understood, Your Honor, and I apologize for not directly answering your question. The answer to that question, our best estimate is what has been set aside, which is, I guess, in the neighborhood of $30 to $35 million. And yet there was no litigation begun by Fortinbras. You just sat back like some of these guys who are class members who are getting $100 out of charity because it's more complicated to administer because their claims are really so small. But you were not here as a lead plaintiff in this litigation or as somebody who brought this action or took any action, notwithstanding a possible claim of $35 million? Well, that's accurate, Your Honor, procedurally. But nonetheless, the posture of the case and the plan of distribution is to provide compensation to anybody who is affected as defined in the plan of distribution. And there are well over, I think, a thousand, I mean, I'm sorry, over 10,000 claimants did get approved for participation. And only, I think, about 1,400 got excluded. We're the only ones who challenged the exclusion. Right. I understand that. Thank you. We'll hear from Mr. Cunningham. And I think you've reserved three minutes of rebuttal. Yes, Your Honor. Thank you. Good afternoon, Your Honors, and may it please the Court. Hal Cunningham for Plaintiffs' Appeals. First of all, I want to clarify that there are over 31,000 claims in this action, not 1,000. To touch on something just said, Fortin-Bross did not file a claim on behalf of third-party investors into Credit Suisse Firms. Fortin-Bross filed a claim on behalf of itself for swaps. Here, all parties agree that interest rate swaps are eligible for claiming under the settlement. But the issue here on this appeal is whether the district court acted within its discretion in denying Fortin-Bross' swap claim. The court found, along with the claims administrators, along with class counsel, insufficient documentation to back Fortin-Bross' $3.3 trillion notional swap claim. This finding is backed by all of the evidence that has been presented. An interest rate swap is a contract between two parties to exchange interest rate payments. The parties are responsible for their respective payments to one another, or the offset between the two, and bear the risk of nonpayment. Fortin-Bross' evidence in support of its claim does not show it entered into swaps. Instead, the evidence shows that Fortin-Bross performed an advisory service for Credit Suisse, for which it was paid a fee. Fortin-Bross served as index advisor to Credit Suisse for the three-factor model index. This is referred to in the papers as the TFMI. Specifically, Fortin-Bross ran an algorithmic model. Based on market data, this model signals long or short positions for certain tenors and currencies of swaps identified in the TFMI index rules. Fortin-Bross' role in the TFI was simply to communicate these signals to Credit Suisse. Credit Suisse managed the index as sponsor and calculation agent. There's simply no evidence that Fortin-Bross transacted in swaps and serving as an advisor to Credit Suisse on the TFMI. Instead, Fortin-Bross simply provided data to Credit Suisse for a fee. As shown by the term sheets that have been produced on this appeal, the TFMI was used in a number of Credit Suisse structured products, such as notes that were issued by Credit Suisse to third-party investors. These are referred to by Fortin-Bross in the papers as the TFMI products. As with the TFMI index itself, there's no evidence supporting that Fortin-Bross entered into swaps with respect to the issuance by Credit Suisse of TFMI products to third parties. I'd like to take a moment to speak briefly on Fortin-Bross' assertion that accolades misled the district court on the data searched by Credit Suisse. Fortin-Bross deduced from a Pelley's brief, I believe on page 28, that counsel asked Credit Suisse to search only the discovery record for index-linked transactions with Fortin-Bross. I would like to clarify here that this is not the case. During the audit of Fortin-Bross' claim, the claims administrator found no transaction supporting Fortin-Bross' claim in the data that has been produced in discovery. Despite no obligation to do so, class counsel reached out to litigation counsel for Credit Suisse and asked that Credit Suisse perform a search of its systems for index-linked transactions with Fortin-Bross. After a month-long process, counsel for Credit Suisse reported that, based on a reasonable search, Credit Suisse did not be able to identify any transactions with Fortin-Bross or its predecessor, Prospero, that were linked to IGFIX. The bottom line is the search was not limited to data produced in discovery. Counsel's representation to the district court was completely accurate. Mr. Cunningham, may I ask, is there any information in the record about what is the order of magnitude of the quantum of the largest recoveries by claimants other than Fortin-Bross? I'm sorry, as far as what? Notional amounts or what claims? No, no, no. I'm talking about money, actual money. People, they have $505 million in this fund, right, to be distributed. And I just would be curious to know if there is anything in the record that says, you know, I'm not asking about tell me how much this particular plaintiff got, but among the, what are the biggest awards that have been made? I'm not sure if that has been made on the record. If it was, it would be anonymized. Well, what is the number? There was a number that I believe the district court referred to. First of all, there was a number of all the people who got $100, right? And that was 20,000 or a huge number of the people who are class members. And then there was a number that was, I think, something like $64,000 as an average or mean or something of some other group of claimants. What does that number represent? Okay. For those not, the claimants amounts were under $100 just to be, just for the distribution to be efficient, received $100. The average that was expressed in the distribution order represents the average across all of those claimants who filed claims that weren't in the, didn't receive the minimum payment amount of $100. So, and the number that that's, how many hundreds or thousands of people are included in that average that adds up to, comes out to $64,000? I'm looking at my papers right here. I apologize for not having this in front of me. Whatever. One moment, please. Well, while I'm pulling it up, the number would be who, the number of claimants that received, that $64,000, I'm just saying this number because it's what you just said to me, would be those, the number of minimum payments made, subtract the minimum payments made minus the total claim. Okay. That's fine. I don't have those numbers in front of me, but that's. Okay. I got it. I understand. I understand. Don't waste any more of your time. I'm sorry. Okay. I appreciate it. Thank you. I guess just one more point I'd like to make why this audit is necessary. In its reply brief, Fortinbras complained that it was treated unfairly, arguing the notional size of Fortinbras' claims should have no bearing on its evaluation. Here, Fortinbras was treated no differently than other claimants with similar notional claim amounts. In this settlement, the claims administrator audited the claims of the top group units' claimants by instrument pool and across all instrument pools. For those claimants who were subject to this review, EPIC requested that the claimants provide documentation or underlying data for all transactions in their claim form. The claims administrator with consulting experts analyzed these documents and data to determine if they matched the transactional notional amount claimed. All deficiencies were resolved with the exception of Fortinbras. This audit process is simply to safeguard the integrity of the fund. Such audits are standard operating procedure in class action settlements. If there are no audit procedures, council would not be discharging our duty to the class. When a claimant files a claim such as this, it has the potential to materially affect the entire settlement allocation. Fortinbras, like other class members who submitted large notional claims, was audited because its claim, if it were valid, had the potential to take funds away from class members who had documented the claims. In closing, we would respectfully submit that the district court's considered determination should not be disturbed. At this point, I'll be happy to answer any further questions your honors may have. If there are no questions, I'll rest on the brief. Thank you, Mr. Cunningham. We'll hear rebuttal. Thank you, your honors. Very briefly. First, the plaintiffs claimed that we did nothing more than crunch hypothetical numbers in exchange for a fee from Credit Suisse. Putting aside the question of why Credit Suisse would pay anyone to crunch hypothetical numbers, that's not what we did. We were, in fact, both an investment advisor and a counterparty for trading on the underlying investments. Those are not mutually exclusive and banks and investment managers do that all the time. Lastly, with regard to the evidence of actual swaps being conducted, we look both at the May data, which includes, it shows the daily changes to the investments. It shows the notional currency amounts in the account of Credit Suisse. That is real money that investors had put on the table and at risk. That money was used to trade interest rate swaps as described on the right side, right column of the spreadsheet. The mid price shows the daily changes to the investment based on the prior day's swap trading. These are Credit Suisse documents, your honors. This is what I urge. The plaintiffs claimed that they asked Credit Suisse's outside counsel to look for documents, but we had asked Credit Suisse for documents in the context of the administration and the audit. They gave us these documents. They gave us these spreadsheets and they gave us the daily emails numbering over 1,100 that confirmed these actual swap trades. The idea that there is no evidence of the reality of these investments is simply not true, unsupported by the record. For that reason, we respectfully request that the district court's decision be vacated and remanded for further proceedings. Thank you. We will take the matter under advisement, nicely argued by both sides. That is the last case on the calendar, so I will ask the clerk to adjourn court. Court is adjourned.